UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES<br>SECURITIES AND EXCHANGE<br>COMMISSION,<br><br>      Plaintiff,<br><br>   v.<br><br>IMPERIAL PETROLEUM, INC.,<br>JEFFREY WILSON, CRAIG DUCEY,<br>CHAD DUCEY, BRIAN CARMICHAEL,<br>JOSEPH FURANDO, EVELYN KATIRINA<br>PATTISON (a/k/a KATIRINA TRACY),<br>CARAVAN TRADING, LLC, CIMA GREEN,<br>LLC and CIMA ENERGY GROUP<br><br>      Defendants. | Civil Action No. 1:13-cv-1489<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission"), states as follows:

## NATURE OF THE ACTION

1.  Imperial Petroleum, Inc. ("Imperial")—acting primarily through its wholly-owned subsidiary, E-biofuels, LLC ("Ebio")—falsely claimed that it produced more than 28 million gallons of biodiesel from at least May 2010 through at least January 2012.  By illegally claiming government incentives and tax credits, the defendants were able to sell that fuel for more than $100 million, realizing gross profits of more than $50 million.  As described below, this illegal and unsustainable business model was not disclosed to Imperial's investors, shareholders or auditors.

2.      In May 2010, Imperial acquired Ebio for Imperial stock and other consideration. In selling Ebio to Imperial, Ebio's owners—Craig Ducey, Chad Ducey and Brian Carmichael ("Carmichael")—falsely represented to Imperial that they were in the business of producing biodiesel from "feedstock" (*i.e.*, raw agricultural products such as soybean oil and chicken fat) and that Ebio had not violated any laws or regulations.  In reality, Ebio used middlemen to buy finished biodiesel and papered the purchases with fake invoices falsely describing the biodiesel as "feedstock."  By falsely claiming it had produced the biodiesel from raw materials, Ebio was able to illegally claim government incentives and tax credits for biodiesel production and sell the biodiesel for substantially more than its acquisition price.

3.      Within weeks after Imperial acquired Ebio, its CEO, Jeffrey Wilson ("Wilson"), learned that Ebio's owners had misrepresented Ebio's business in critical respects.  Nonetheless, he took no corrective action and allowed Ebio's business to continue in the same manner.

4.      After the acquisition, Imperial's annual revenue increased from approximately $1 million to approximately $110 million, more than 99% of which was from Ebio's illegal business.  In periodic reports filed with the Commission and provided to shareholders, and in separate statements made to prospective investors, Imperial, Wilson, Craig Ducey and Chad Ducey misrepresented the fundamental nature of Ebio's business model by falsely stating that Ebio produced biodiesel from raw feedstock, and they failed to disclose that Ebio's business was almost entirely illegal and unsustainable.

5.      Both before and after Imperial's acquisition of Ebio, the fraudulent recertification scheme and the resulting deception of investors depended on middlemen—*i.e.*, Joseph Furando ("Furando"), Katirina Tracy ("Tracy") and the companies they controlled, Caravan Trading, LLC ("Caravan"), CIMA Green, LLC ("CIMA Green") and CIMA Energy Group ("CIMA

Energy")—to purchase biodiesel from third-party suppliers ("Third-Party Biodiesel Suppliers") and resell it to Ebio.  In addition to knowing about Ebio's illegal recertification of biodiesel, these middlemen understood that the scheme involved convincing outside investors to invest in Imperial, and they provided false and misleading documents to help induce such investments.

## JURISDICTION

6.      The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(e), 78aa].

7.      The acts, practices and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the Southern District of Indiana and elsewhere.

8.      Defendants, directly and indirectly, have made, and are making, use of the means and instrumentalities of interstate commerce and of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

## THE DEFENDANTS

9.      Imperial Petroleum, Inc. ("Imperial") is headquartered in Evansville, Indiana. During the relevant time period, more than 99% of Imperial's revenues came from its wholly-owned subsidiary, Ebio.  Imperial's common stock is registered under Section 12(g) of the Exchange Act.

10.     Jeffrey Wilson ("Wilson"), age 60, is a resident of Evansville, Indiana.  He was the CEO and sole executive of Imperial from at least January 1, 2010 through his November 7, 2011 resignation.  After Ebio (but not Imperial) declared bankruptcy in April 2012, Wilson returned as Imperial's CEO and has remained in that position through the filing of this

Complaint.  While CEO, Wilson had ultimate authority over and controlled the day-to-day operations of Imperial, he possessed and exercised the power to make decisions on behalf of the company and he possessed and exercised the power to direct or cause the direction of the management and policies of Imperial.

11.    Craig Ducey, age 42, resides in Fishers, Indiana.  Craig Ducey, his brother Chad Ducey and Brian Carmichael founded Ebio in 2006.  During the relevant time period, Craig Ducey was Ebio's president.

12.    Chad Ducey, age 38, is a chemical engineer and a resident of Fishers, Indiana. During the relevant time period, Chad Ducey was Ebio's COO and was responsible for overseeing the physical operations of Ebio's biodiesel plant.

13.    Brian Carmichael ("Carmichael"), age 36, resides in Bend, Oregon.  From 2006 until fall 2010, Carmichael lived in Indiana and was Ebio's lead sales manager.

14.    Joseph Furando ("Furando"), age 47, resides in Montvale, New Jersey.  Furando and his wife own Caravan Trading, LLC, CIMA Green, LLC, CIMA Energy Group and other affiliated companies.  Furando has known about and participated in the fraudulent biodiesel recertification scheme since at least early 2010.

15.    Evelyn Katirina Pattison, a/k/a Katirina Tracy ("Tracy"), age 27, lived during the relevant period with Furando and his family at their home in Montvale, New Jersey.  During the relevant time period, Tracy was Furando's second-in-command at Caravan Trading, LLC, CIMA Green, LLC, CIMA Energy Group and other affiliated companies.  She has known about and participated in the fraudulent biodiesel recertification scheme since at least early 2010.

16.    Caravan Trading, LLC ("Caravan") is a company located in Park Ridge, New Jersey.  Caravan—under the direction of Furando and Tracy—acted as one of the middlemen for

the recertification scheme; it purchased biodiesel from third-party suppliers and resold that fuel to the other defendants so they could fraudulently recertify that fuel.

17.     CIMA Green, LLC ("CIMA Green") is another entity run by Furando and Tracy. It operates out of the same location and shares the same employees as Caravan.  Sometimes Furando and Tracy used CIMA Green, LLC or CIMA Energy Group to facilitate the fraudulent scheme.

18.     CIMA Energy Group ("CIMA Energy") is another entity run by Furando and Tracy.  It operates out of the same location and shares the same employees as Caravan.

## THE FACTS

## I.     BIODIESEL AND GOVERNMENT INCENTIVES

19.     Biodiesel is a renewable fuel made from agricultural products such as soybean oil, animal fat and other natural oils and greases.  These products are referred to in the industry as feedstock.  Through a chemical process called transesterification, glycerin is separated from the fat or vegetable oil, leaving behind methyl esters (the chemical name for biodiesel).

20.     Pure biodiesel is designated as B100, which certifies that it is 100% biodiesel. Biodiesel that has been blended with petroleum-based diesel fuel is designated as Bxx, where xx represents the percentage of biodiesel fuel in the blend—*e.g.*, B100 that has been blended with 0.1% petroleum-based diesel fuel is B99.9.

21.     The Renewable Fuel Standards ("RFS") program was created under the Energy Policy Act of 2005, which established the first renewable fuel volume mandate in the United States.  RFS was followed by RFS2, which became effective in July 2010.

22.     The RFS2 renewable fuel mandate required petroleum refiners and importers ("Obligated Parties") to incorporate into their petroleum-based fuel a certain percentage of

renewable fuel or to purchase renewable fuel credits from third parties.  These credits, which are regulated by the United States Environmental Protection Agency ("EPA"), are called renewable identification numbers, commonly referred to as RINs.  Under this system, a unit of renewable fuel can legally generate RINs once and only once.

23.     An EPA-registered producer may generate RINs for each unit of renewable fuel it produces.  A biodiesel producer may generate 1.5 RINs for each gallon of biodiesel produced from feedstock.  Biodiesel can be sold with the RINs attached or, in certain circumstances, the RINs may be separated from the fuel and sold as a separate commodity.

24.     Obligated Parties submit the RINs to the EPA to meet their specific renewable fuel volume obligations.  Thus, to comply with RFS2, Obligated Parties must buy renewable fuel with RINs attached, buy RINs that have been separated from fuel or produce renewable fuel themselves.

25.     RINs have had a significant impact on the price of biodiesel due to their value in meeting regulatory requirements.  Based on RIN trading prices, RINs added approximately $0.42 to the value of a gallon of biodiesel at the time Imperial acquired Ebio in May 2010.  RIN prices peaked in September 2011, adding approximately $2.95 to the value of a gallon of biodiesel.

26.     The other major government incentive was the Blenders' Tax Credit, which provided a $1/gallon tax credit to the first person to blend the biodiesel with at least 0.1% petroleum-based diesel fuel.  Given the low cost of diluting B100 with 0.1% petroleum-based diesel fuel, this tax credit made a gallon of B100 worth approximately $1 more than a gallon of B99.9 (hereinafter "B99").

27.     The RFS2 system necessarily requires RINs to be separated from the renewable fuel and submitted to the EPA to satisfy renewable fuel volume obligations.  The result is a

supply of RINless B99 that is worth much less than B100 with RINs.  The defendants were able to generate fraudulent profits by: (1) buying RINless B99 at or near market price; (2) fabricating an invoice describing the transaction as the purchase of soybean oil or some other legitimate type of feedstock; and (3) falsely certifying to the EPA that they had produced B100.  The Ebio Defendants then (i) pretended to blend the biodiesel, improperly received tax credits and sold B99 with fraudulent RINs, and also (ii) sold "B100" with fraudulent RINs and a fraudulent tax credit.

## II.   HOW THE EBIO SCHEME BEGAN

28.   Beginning in or about 2006, Ebio attempted to produce biodiesel legitimately with limited success.

29.   In or about the fall of 2009, Furando, Tracy and one or more of the companies they controlled—Caravan, CIMA Green and/or CIMA Energy—(hereinafter collectively referred to as the "Middlemen Defendants") agreed to broker the sale of biodiesel to Ebio and began supplying Ebio with RINless B99.

30.   In or about spring 2010, Furando suspected that Ebio was illegally recertifying the fuel as B100 with RINs.  During a conversation with Craig Ducey and Chad Ducey, Furando demanded a share of the profits from Ebio's recertification scheme.  The three worked out a deal whereby the Middlemen Defendants would sell RINless B99 to Ebio at inflated prices; the profits of the sale representing Furando's compensation for his part in the illegal scheme.  The Middlemen Defendants also provided Ebio with false invoices describing the transactions as the sale of feedstock.

31.   When Imperial acquired Ebio, the Middlemen Defendants had already sold more than 1 million gallons of RINless B99 to Ebio, and the recertification fraud had already begun.

### III.   IMPERIAL'S CONTINUATION AND EXPANSION OF THE SCHEME

32.     Imperial's acquisition of Ebio closed on May 24, 2010.  Imperial purchased Ebio by providing to the original owners of Ebio (including Craig Ducey, Chad Ducey and Carmichael) notes totaling $3.75 million plus two million shares of Imperial stock.  In the written acquisition agreement—which they signed in their individual capacities—Craig Ducey, Chad Ducey and Carmichael misrepresented that Ebio was not in violation of any laws or regulations and failed to disclose the illegal scheme.

33.     A year later, Imperial converted the notes to approximately 4.9 million additional shares of Imperial stock issued to the original owners of Ebio.  In fall 2011, Imperial paid $1 million each to Craig Ducey and Chad Ducey to redeem a portion of their Imperial stock at $1/share.

34.     After the acquisition, the fraudulent biodiesel recertification scheme continued as before.  In its Forms 10-K for fiscal years 2010 and 2011, Imperial stated that from May 24, 2010 (the closing date of Imperial's acquisition of Ebio) to July 31, 2011 (the end of Imperial's fiscal year 2011), Ebio produced and sold more than 28 million gallons of biodiesel.  Wilson, Craig Ducey, Chad Ducey, Carmichael (collectively the "Ebio Defendants") and/or individuals under their direction misrepresented to Ebio customers that the product sold by Ebio was B100 with valid RINs.  In reality, at least 90% of the more than 28 million gallons sold by the Ebio Defendants was actually fraudulently recertified RINless B99 provided by the Middlemen Defendants.

35.     One of the Third-Party Biodiesel Suppliers stored its biodiesel at fuel terminals located in or around Argo, Illinois, Houston, Texas and other locations.  The Middlemen Defendants never took physical possession of the biodiesel they purchased from that supplier.

Instead, they re-sold that same fuel to the Ebio Defendants and the Ebio Defendants (and/or an individual under their direction) were responsible for transporting (or arranging for the transport of) that fuel from the appropriate fuel terminal to Ebio customers.

36.     One of three scenarios would occur after the Ebio Defendants (and/or an individual under their direction) picked up the RINless B99 from the fuel terminal: (i) Filtering (see Paragraph 37 of this Complaint); (ii) Turn-n-Burns or Flipping a Load (see Paragraph 38 of this Complaint); or (iii) Ghost Loads (see Paragraphs 39-41 of this Complaint).

37.     The Ebio Defendants (and/or an individual under their direction) transported some of the RINless B99 from the fuel terminals to Ebio's Middletown facility, where it was put in tanks.  The fuel, which was already a methyl ester, was not subjected to transesterification or any other chemical reaction.  The Ebio Defendants (and/or an individual under their direction) then had the fuel loaded into different trucks and transported it to Ebio customers along with a fraudulent paperwork falsely stating that the fuel was B100 with valid RINs and that the fuel had been produced by Ebio.  Ebio employees and truck drivers referred to this process as "Filtering."

38.     The Ebio Defendants (and/or an individual under their direction) also had truck drivers transport loads of RINless B99 from the fuel terminals to Ebio's Middletown facility and then leave again without unloading the fuel.  At the Ebio plant, the drivers exchanged the real Bill of Lading ("BOL"), which correctly identified a fuel terminal as the point of origin for the shipment, for a fraudulent BOL and other paperwork, which incorrectly identified Ebio as the point of origin, falsely stated that the fuel was B100 with valid RINs and falsely stated that the fuel had been produced by Ebio.  The Ebio Defendants (and/or an individual under their direction) then had the truck drivers deliver the fuel to the Ebio customer along with the

fraudulent paperwork.  Ebio employees and truck drivers referred to this process as "Turn-n-Burns" or "Flipping a Load."

39.     The Ebio Defendants (and/or an individual under their direction) also had truck drivers transport loads of RINless B99 from fuel terminals directly to Ebio customers.  Ebio employees and truck drivers referred to this process as "Ghost Loads."  For the Ghost Loads, the Ebio Defendants (and/or an individual under their direction) faxed fraudulent BOLs and other paperwork to truck stops or other locations so the truck driver could pick up those documents without stopping at Ebio's Middletown facility.  As with the other loads, the fraudulent BOLs and paperwork given to Ebio customers incorrectly identified Ebio as the point of origin, falsely stated that the fuel was B100 with valid RINs and falsely stated that the fuel had been produced by Ebio.

40.     Ghost Loads account for more than 29% of all the biodiesel that the Ebio Defendants sold and shipped to Ebio customers during the time period of May 24, 2010 through January 31, 2012.  Ghost Loads accounted for more than 10.2 million gallons of the biodiesel purportedly "produced" by Ebio during this time period.

41.     The Ghost Loads provide irrefutable proof of the fraudulent scheme because those gallons of biodiesel were never present at, much less produced by, Ebio's Middletown facility.  For example, approximately 4.2 million gallons of the RINless B99 purchased by the Ebio Defendants was stored by a Third-Party Biodiesel Supplier at a fuel terminal in Galena Park, Texas.  The Ebio Defendants (and/or an individual under their direction) had truck drivers pick up those approximately 4.2 million gallons of RINless B99 from that Galena Park fuel terminal and deliver that fuel to an Ebio customer located less than twenty miles away.  The Ebio Defendants (and/or an individual under their direction) provided that customer with fraudulent

documents that incorrectly identified Ebio as the point of origin, falsely stated that the fuel was B100 with valid RINs and falsely stated that the fuel had been produced by Ebio. The Ebio Defendants obtained approximately $7.8 million in illegal profits on those shipments alone.

42.     For the shipments described in Paragraphs 34-41 of this Complaint, Craig Ducey, Chad Ducey and Carmichael, or employees under their direction, created the fraudulent Bills of Lading ("BOLs") and invoices incorrectly indicating that all such shipments originated at Ebio's Middletown facility and that the shipments were loads of B100 with valid RINs.

### A.     WILSON LEARNED THAT EBIO WAS USING A PROCESS OTHER THAN TRANSESTERIFICATION TO PRODUCE BIODIESEL

43.     Soon after the acquisition closed, Wilson learned that Ebio's owners had misrepresented the company's business model in material respects. By mid-June 2010 at the latest, Wilson knew that Ebio was purchasing and reselling biodiesel instead of producing its own fuel from raw feedstock. Subsequently, he defrauded Imperial's shareholders and prospective and actual investors when he knowingly misrepresented that Ebio produced biodiesel from raw feedstock.

44.     In mid-June 2010, Craig Ducey told Wilson that, instead of producing biodiesel from raw feedstock, Ebio was "cleaning up" and reselling biodiesel. This was not true; Ebio was fraudulently recertifying RINless B99 purchased from the Middlemen Defendants. Nevertheless, the process described by Craig Ducey was fundamentally different than Ebio's purported business model of producing biodiesel from raw feedstock that was described to Imperial's investors and shareholders.

45.     In a June 15, 2010 e-mail to Craig Ducey, Wilson inquired "[i]sn't the margin better on feedstock instead of cleaning up biodiesel" and further asked if he was "wasting [his] time trying to get feedstock financing to load this plant?" In a response dated a day later, Craig

Ducey emailed to Wilson a spreadsheet showing a cost comparison of using actual feedstock to produce biodiesel (conclusion: Ebio loses money) versus using "off spec" biodiesel as "feedstock" (conclusion: Ebio makes money).  According to the spreadsheet (which was created by Carmichael), the processing cost for transesterification with actual feedstock is $0.27/gallon and the processing cost for using "off spec" biodiesel is $0.00.

46.     Before the acquisition, Ebio purportedly purchased and reprocessed some "off spec" biodiesel—*i.e.*, Ebio's owners claim they bought partially processed fuel that did not meet all of the specifications for biodiesel and finished processing that fuel.  Even though the applicable EPA regulations do not permit RINs to be generated using "off spec" biodiesel as a feedstock, Ebio used that fuel to fraudulently generate RINs.  Subsequently, the Ebio Defendants purchased RINless B99 (*i.e.*, finished fuel) from the Middlemen Defendants.  The Ebio Defendants also referred to the RINless B99 purchased from the Middlemen Defendants as "off spec" feedstock even though they knew that description was false.

47.     On June 14, 2010, Imperial filed its Form 10-Q for the quarter ending April 30, 2010.  In that filing—which was signed and certified by Wilson—Imperial reported the May 2010 acquisition of Ebio as a subsequent event and falsely stated that Ebio "produces biodiesel from waste grease feedstocks."  Within a day, Wilson received the above-described e-mail from Craig Ducey and learned that the description contained in the 10-Q was false and fundamentally inconsistent with Ebio's actual business model.  Despite his knowledge, Wilson never amended this filing.

48.     Further, by mid-September at the latest, Wilson knew that Ebio was not producing any biodiesel at all.  On September 15, 2010, Wilson's son Aaron Wilson (who worked onsite at Ebio's facility) forwarded Wilson an email from Chad Ducey stating, "We are currently not

producing any glycerin."  Wilson asked his son, "If they are making biodiesel, how is this possible?  Are all they doing is re-handling someone else's stuff?"  Aaron Wilson responded, "For the most part yes, they aren't processing much virgin feedstock that I'm aware of."  Still Wilson failed to amend Imperial's prior 10-Q and continued in subsequent filings and disclosures to falsely state that Ebio produced biodiesel from feedstocks.

49.     Shortly after the acquisition, Chad Ducey hired a chemical engineer named Jerry Caskey to provide a third-party engineering report required by the EPA (the "June 2010 Caskey Report").  Based on fraudulent documents and false information provided by Chad Ducey, the June 2010 Caskey report incorrectly stated that Ebio uses transesterification to produce biodiesel from raw feedstock.  In the summer of 2011, long after he learned that Ebio did not use feedstock and instead merely resold biodiesel purchased from the Middlemen Defendants, Wilson gave the June 2010 Caskey Report to actual and potential investors to mislead them into believing that Ebio produced biodiesel from raw feedstock.

**B.     IN ITS FORM 10-K FOR FISCAL YEAR 2010 AND IN SUBSEQUENT PERIODIC REPORTS, IMPERIAL FALSELY STATED THAT EBIO PRODUCES BIODIESEL FROM TRADITIONAL FEEDSTOCKS**

50.     Imperial's fiscal year ends on July 31st.

51.     In its Form 10-K for fiscal year 2010 (the "2010 10-K") filed on November 15, 2010, Imperial falsely reported that "[d]uring the period from May 24, 2010 through July 31, 2010, the [Ebio] plant produced approximately 1.8 million gallons of biodiesel."

52.     Similarly, the footnotes to the financial statements contained in this filing misrepresent that Imperial's principal business consisted of "biodiesel production."

53.     The 2010 10-K also falsely represented in several places that Ebio uses chicken grease as its primary feedstock to produce biodiesel through the traditional process of transesterification.  For example, the 10-K stated:

> The [Ebio] plant operates two process trains using traditional catalyst technology to produce biodiesel from vegetable, mineral and animal oils and greases. The primary feedstock used to make biodiesel at the facility is premium white grease (chicken fat) which is purchased as needed from various suppliers in open-market transactions. Additional feedstocks that could be used, depending upon cost, are: vegetable oils, mineral oils and animal oils and fats…. The biodiesel produced, which represents approximately 80% of the feedstock input to the plant (due to losses and glycerin production, a by-product of the production process) is required to meet stringent standards set by the federal government in order to be used as transportation fuel additives.

54. In truth, all or almost all of Ebio's claimed biodiesel production reported in the 2010 10-K was the result of fraudulently recertified RINless B99. Because the scheme does not require or involve transesterification, there is no loss of volume due to glycerin production or other factors.

55. From May 24, 2010 (the closing date of Imperial's acquisition of Ebio) to July 31, 2010 (the end of Imperial's 2010 fiscal year), Ebio purchased approximately 1.9 million gallons of RINless B99 from the Middlemen Defendants. This fact was not disclosed in Imperial's 2010 10-K.

56. The 2010 10-K did not disclose that approximately 18% of the approximately 1.9 million gallons referred to in Paragraph 55 of this Complaint were Ghost Loads that were picked up from fuel terminals and transported directly to Ebio's customers, completely bypassing Ebio's Middletown facility.

57. Wilson knew from at least mid-June 2010 that Ebio was not operating in the manner described in the 2010 10-K and knew from at least mid-September 2010 that Ebio was not producing any biodiesel at all. Nevertheless, Wilson signed and certified the accuracy of the 2010 10-K.

58. For the next three quarters, Imperial filed Forms 10-Q (filed on December 15, 2010, March 15, 2011 and June 14, 2011) containing similar false statements, misrepresentations

and omissions—*i.e.*, falsely describing Ebio's business as "biodiesel production" and misrepresenting that Ebio uses raw feedstocks, primarily "premium white grease (chicken fat)" to produce biodiesel through transesterification. Wilson signed and certified the accuracy of each of those Forms 10-Qs filed by Imperial.

### C. THE MIDDLEMEN DEFENDANTS PROVIDED CRAIG DUCEY WITH A BLANK CARAVAN INVOICE AND ALSO DIRECTED EBIO TO MAINTAIN A MINIMAL LEVEL OF LEGITIMATE BIODIESEL PRODUCTION

59.     In early- or mid-2011, the Middlemen Defendants fell behind in their production of fabricated feedstock invoices for the Ebio Defendants. The Middlemen Defendants provided Craig Ducey with a template of a blank Caravan invoice and told him to take over the job of creating the false feedstock invoices. Subsequently, Craig Ducey, Chad Ducey or employees under their direction used this template to create false feedstock invoices.

60.     During the same time period, the Middlemen Defendants created an entity named Green Grease Solutions ("GGS") to supply Ebio with small amounts of real feedstock. Even though GGS earned little to no profit on these transactions, the Middlemen Defendants believed it critical to the fraudulent scheme for Ebio to maintain the façade of legitimate biodiesel production as described in Imperial's filings with the Commission.

61.     In June 2011, Ebio began producing small amounts of biodiesel from raw feedstock (*i.e.*, the small amounts purchased through GGS) for the first time since mid-2009.

### D. THE "WHAT'S REALLY HAPPENING" E-MAIL

62.     In May 2011, Aaron Wilson sent an e-mail to his father, Jeff Wilson (Imperial's CEO), outlining "what's really happening" at Ebio. Contrary to the representations made by Imperial in its periodic filings with the Commission, this report confirmed that Ebio does not produce biodiesel from raw feedstock. Wilson was told in this e-mail report that (i) a biodiesel

company produces and sells B100 to a specific Third-Party Biodiesel Supplier, (ii) Ebio uses

Caravan as a middleman to purchase that finished fuel from that supplier, and (iii) Ebio then

generates RINs and sells the biodiesel at a substantial markup:

> [A Third-Party Biodiesel Supplier] sells [the fuel] to Caravan by barge for
> $4.30 and makes 30 cents minus transport.  Caravan sells to E-bio for
> $4.45 plus delivery and makes 15 cents per gallon for doing almost
> nothing.  E-bio generates RINs & therefore can sell the product for full
> market value of $5.25.
>
> I think this example paints a fairly accurate picture of what's really
> happening.

63.     This factual description of "what's really happening" was fundamentally

inconsistent with (i) Imperial's representations about Ebio's business model contained in

Imperial's periodic filings with the Commission; and (ii) Wilson's representations to investors.

### E.     EBIO FALSIFIED ITS EPA ATTESTATION REPORT FOR CALENDAR YEAR 2010

64.     Every year, a RIN-generating renewable fuel producer must hire a firm to review

its compliance with the applicable EPA regulations and prepare an Attestation Report.  These

reports must be filed with the EPA by May of the next calendar year—*e.g.*, a company's

Attestation Report for calendar year 2010 must be filed with the EPA by May 2011.

65.     In or about 2010, Craig Ducey or employees under his direction submitted

multiple RIN-generation reports to the EPA falsely stating that all of Ebio's RINs were generated

based on biodiesel produced by Ebio and that all such biodiesel was created through the

transesterification of raw feedstock.

66.     The Ebio Defendants hired Weaver Tidwell LLP ("Weaver Tidwell") to prepare

Ebio's 2010 Attestation Report.  Craig Ducey, Chad Ducey or employees under their direction

provided to Weaver Tidwell fabricated feedstock invoices (many of which were created and

provided to Ebio by the Middlemen Defendants) and Ebio's false RIN-generation reports that

were filed with the EPA.  Relying on those false documents, Weaver Tidwell filed an attestation report with the EPA in May 2011 incorrectly stating that the feedstock used by Ebio met the definition of a renewable biomass (*i.e.*, raw feedstock).

67.     After May 2011, Wilson, Craig Ducey and Chad Ducey provided Ebio's 2010 Attestation Report to prospective investors as proof of Ebio's compliance with EPA regulations even though they knew the underlying "feedstock" invoices were false and that Ebio purchased and resold finished biodiesel instead of producing that fuel from raw feedstock.

### F.     WILSON, CRAIG DUCEY AND CHAD DUCEY MISREPRESENTED MATERIAL FACTS IN AN UNSUCCESSFUL SECURITIES OFFERING TO PLATINUM PARTNERS

68.     In the summer of 2011, Imperial hired Rodman & Renshaw ("Rodman") as Imperial's exclusive placement agent for a proposed offering of Imperial securities.  In the contract with Rodman (which was executed by Wilson), Imperial agreed to provide information requested by Rodman and also acknowledged that "Rodman will use and rely entirely upon such information as well as publicly available information regarding the Company [*i.e.*, Imperial]."

69.     In the summer or fall of 2011, Wilson gave Rodman a document entitled "Biofuels Business Plan" which falsely stated that Ebio "operates as a producer of biofuels from a variety of animal fats and tallows and refined soybean oil" and misrepresented that Ebio uses a traditional transesterification process to produce biodiesel.

70.     In late June 2011, Wilson pitched Imperial to potential investors during multiple "Road Show" conference calls set up by Rodman.  During those calls, Wilson falsely stated that Ebio produces biodiesel through transesterification from raw materials, primarily premium white grease (*i.e.*, chicken fat).  Wilson did not inform the investors that Ebio actually purchased RINless B99 and fraudulently recertified it as B100 with RINs.

71.     In one of the Road Show conference calls, Rodman introduced Imperial to a hedge fund investor named Platinum Partners ("Platinum").

72.     In mid-July 2011, Platinum agreed that, upon the satisfactory completion of its due diligence review, it would provide Imperial up to $27.5 million in exchange for notes and Imperial stock.

73.     In the summer of 2011—after he had received the May 2011 e-mail from his son (see Paragraphs 62-63 of this Complaint)—Wilson provided Platinum with Imperial's most recent 10-K (filed on November 15, 2010) and 10-Qs (filed on December 15, 2010, March 15, 2010 and June 14, 2011), Ebio's 2010 Attestation Report and other documents by uploading them to a virtual data room as part of the due diligence process.  As discussed above, these documents contained false statements and omitted material information.

> **(i)     WILSON TRIED TO CONVINCE PLATINUM NOT TO HIRE A THIRD-PARTY RENEWABLE ENERGY CONSULTANT TO EVALUATE EBIO**

74.     In mid-July 2011, Imperial and Platinum discussed the need for Platinum to hire a third-party consultant to inspect Ebio's facility as part of the due diligence process.

75.     Wilson e-mailed to Platinum the June 2010 Caskey Report (which falsely states that Ebio produces biodiesel from raw feedstocks through transesterification) and inquired whether that report, when updated, would satisfy Platinum's need for a third-party consultant. Platinum said no and hired a renewable energy consultant named Frazier Barnes & Associates ("FBA").

76.     Wilson sent an e-mail to Craig Ducey and Chad Ducey (*i.e.*, two of the main individuals who would be interacting with FBA during the due diligence process) instructing them to avoid any discussion of "off-spec" biodiesel (which he referred to as off spec methyl esters): "Unless we are asked, avoid a direct conversation about 'off spec' methyl esters being a

feedstock source.  I would use the summary that I use in presentations, that we are 'opportunity' feedstock purchasers based on market condition and that from time-to-time we also blend products which allows us to handle higher volumes."

77.     This explanation—which Wilson also used in presentations to potential investors—affirmatively misrepresented Ebio's true business model.

78.     In late July 2011, Caskey made his second and final visit to Ebio's facility for the purpose of updating his June 2010 report.  Chad Ducey met with Caskey and provided all of the new information contained in Caskey's updated report (hereinafter the "August 2011 Caskey Report").  That updated report was similar to the June 2010 Caskey Report except that it noted that Ebio had "expanded their biofuels process to include feedstocks requiring esterification and the processing of recycled methyl ester feedstocks."  The report's limited discussion of "recycled methyl ester feedstocks"—which appears to be another term for "off spec" biodiesel—did not accurately describe Ebio's true business model.

### (ii)   WILSON TOLD PLATINUM THAT EBIO USES "OFF SPEC" METHYL ESTERS AS FEEDSTOCK

79.     In response to multiple questions from Platinum regarding Ebio's feedstock vendors and the sustainability of Ebio's profit margins, Wilson provided the August 2011 Caskey Report to Platinum and, in an August 1, 2011 e-mail to Platinum, stated: "[r]ight now we have a stream of 'off spec' methyl esters that is available to us which has nice margins and requires very little processing time."

80.     In truth, Ebio did not use "recycled" or "off spec" methyl esters as feedstock; Ebio purchased RINless B99 biodiesel and fraudulently recertified it as B100 with valid RINs.

81.     Moreover, Ebio's business model did not recently change as implied by both the August 2011 Caskey Report and Wilson's e-mail—Ebio had been fraudulently recertifying finished biodiesel since at least late 2009.

82.     By mid-June 2010, Wilson knew that Ebio was "cleaning up biodiesel" and, by mid-May 2011 at the latest, he was told that the "feedstock" used by Ebio was actually finished biodiesel purchased from Caravan.

83.     The primary Rodman investment banker dealing with Imperial was confused when he learned about Wilson's statement that Ebio uses "off spec" methyl esters as feedstock. Up to that point, Wilson had informed the Rodman investment banker and potential investors that Ebio's primary feedstock was premium white grease (*i.e.*, chicken fat).

84.     After he learned about Wilson's statement to Platinum regarding Ebio's purported use of "off spec" methyl esters, the Rodman investment banker had a telephone conversation with Wilson and another telephone conversation with Wilson and Craig Ducey.

85.     In those telephone conversations, Wilson and Craig Ducey acknowledged that very little of Ebio's revenue came from processing premium white grease.  Instead of telling the truth, however, they falsely stated that most of Ebio's revenues came from "off spec" methyl esters and that Ebio's use of "off spec" methyl esters was a recent development.

86.     In one or both of those telephone conversations, the Rodman investment banker noted that Imperial's public filings do not mention the use of "off spec" methyl esters.  The Rodman investment banker asked Wilson whether he thought Imperial's Forms 10-K and 10-Qs needed to be updated so that investors are not misled.

87.     Although Wilson told the Rodman investment banker he agreed that Imperial's filings with the Commission should be amended so that the investing public would have accurate information about how Imperial conducts its business, Imperial never amended those filings.

### (iii)   FBA'S SITE VISIT AND FBA'S CONCERNS REGARDING THE VALIDITY OF EBIO'S RINS

88.     In early August 2011, representatives from FBA toured Ebio's Middletown plant. During that tour and during a follow-up telephone call, both Chad Ducey and Craig Ducey falsely told the FBA engineers that Ebio re-processed "off-spec" methyl esters, that each batch of "off-spec" feedstock was tested when it arrived at Ebio's facility and that the processing method was customized for each "off spec" batch to bring it up to the required specifications for biodiesel.

89.     During the follow-up telephone call with the FBA engineers, Craig Ducey falsely stated that Ebio buys its "off spec" product from a "wide variety of sources," Ebio tests all of that product and "none of it qualifies as fuel."

90.     During the follow-up telephone call with the FBA engineers, Chad Ducey and Craig Ducey referred the FBA engineers to the Caskey Reports and Ebio's 2010 Attestation Report as proof of Ebio's compliance with the applicable EPA regulations.

91.     Nobody associated with Imperial or Ebio told the FBA engineers that Ebio purchased millions of gallons of B99.

92.     Ebio's purchase of B99 would have raised a red flag with FBA because Ebio represented that it sold B100 to its customers.

93.     Ebio did not have the ability to turn B99 back into B100.

94.     Wilson, Craig Ducey and Chad Ducey unsuccessfully tried to persuade the FBA engineers that Ebio's RINs were valid by directing FBA to the August 2011 Caskey Report and Ebio's 2010 EPA Attestation Report.

95.     Wilson, Craig Ducey and Chad Ducey misrepresented to the FBA engineers that Ebio was processing "off spec" methyl esters.  Nevertheless, the FBA engineers still concluded that the RINs generated by Ebio based on such "off spec" product were invalid.

96.     In its August 2011 report to Platinum, FBA explained that, to generate RINs, biodiesel must be made by a renewable biomass "facility" using an EPA-approved feedstock.  To qualify as a "facility," the applicable EPA regulations require that the entire biodiesel production process (from introduction of the raw feedstock to production of the finished biodiesel) occur at a single location.  FBA informed Platinum that (i) Ebio's Middletown plant could not meet this definition because Ebio's purchase of "off spec" methyl esters necessarily meant that it used a product that had undergone transesterification in somebody else's facility (*i.e.*, the product already had been changed from a raw feedstock to a methyl ester); and (ii) "off spec" methyl esters are not an EPA-approved feedstock.

97.     On August 5, 2011, Platinum told Wilson in writing about FBA's conclusion that Ebio's RINs were invalid.  In an August 5, 2011 e-mail, Wilson asked Platinum to confirm his understanding of FBA's conclusions:  ". . . They [*i.e.*, FBA] apparently indicate we are illegally attaching RINs to the off spec products we are purchasing as feedstocks . . . ."  In an e-mail response on August 5, 2011, a Platinum representative confirmed FBA's conclusion that Ebio's RINs were invalid: ". . . they just do not believe [the RINs] are eligible in the form the company currently acquires and processes the acidic and off spec B100."

98.     After he failed to convince FBA that Ebio's RINs were valid, Wilson tried the same arguments with Platinum.  On August 9, 2011, Wilson e-mailed to Platinum a "white paper" he authored (without consulting an attorney, engineer or anyone else) based on the conclusions from his son's May 2011 e-mail (see Paragraph 62 of this Complaint).  This "white paper" does not address the EPA regulations cited by FBA.

99.     Due to FBA's concerns about Ebio's RINs, Platinum decided not to invest in Imperial.  Platinum did not tell Rodman why it did not invest in Imperial.  After the failed securities offering with Platinum, Wilson knew by mid-August 2011 that: (i) a Rodman investment banker had questioned the accuracy of Imperial's most recent forms 10-K and 10-Qs because those filings did not accurately describe Ebio's business model; and (ii) a third-party expert in renewable energy concluded that Ebio's RINs were invalid.  Despite this knowledge, Wilson continued to provide the same inaccurate documents to other prospective investors and Imperial's auditors and affirmatively misrepresented Ebio's true business model in filings with the Commission and in subsequent communications with prospective investors.

### H.   IMPERIAL'S "FEEDSTOCK" SUPPLY AGREEMENT WITH CARAVAN

100.    To address questions received from prospective investors regarding the sustainability of Ebio's profit margins, Wilson and Craig Ducey explained to Furando and Tracy that they needed a long term "feedstock" supply agreement.  Furando and Tracy agreed to provide such a supply agreement.

101.    In August 2011, Imperial and GGS signed a letter agreement promising to discuss a multiple-year feedstock supply agreement.

102.    In a separate written agreement signed around the same time, Imperial agreed to pay Caravan $3.2 million for 820,000 gallons of "biodiesel."

103.     Wilson and Craig Ducey exchanged e-mails expressing their concern over the term "biodiesel" in the contract with Caravan and agreed that it would be better if the contract used the terms "biodiesel feedstock" or "off spec methyl esters."  However, the written contract contains the phrase "820,000 gallons of biodiesel" rather than the terms discussed by Wilson and Craig Ducey.

104.     Wilson drafted and Furando approved an Imperial press release regarding the upcoming feedstock contract with GGS.  That press release falsely described GGS as "our primary feedstock supplier."

105.     Imperial and Ebio purchased very little legitimate feedstock from anyone.  As exemplified by Imperial's near contemporaneous contract to purchase 820,000 gallons of "biodiesel" from Caravan, almost all of the product the Ebio Defendants purchased from the Middlemen Defendants was actually finished biodiesel.  By design, the press release misled investors that Ebio would have a multi-year supply of raw feedstock for purposes of producing biodiesel through transesterification.

## I.     IMPERIAL AND WILSON MISREPRESENTED MATERIAL FACTS TO PIPE INVESTORS

106.     In September 2011, Rodman held its annual Global Investment Conference in New York (hereinafter the "Rodman Conference").

107.     At the Rodman Conference, Wilson gave a power point presentation about Imperial, which included a video about Ebio falsely describing its use of the traditional transesterification process to produce biodiesel from waste oils and greases.

108.     At the Rodman Conference, Wilson also met in small groups with prospective investors.  In his meetings with investors, Wilson's description of Ebio's business model was the same as in his power point presentation.

109.    The purpose of Wilson's presentation and the meetings was to raise funds for Imperial through a Private Investment in Public Equity Securities financing, also known as a "PIPE."  This effort was successful and Imperial received approximately $3.2 million from the PIPE.

110.    Wilson also provided the PIPE investors with Imperial's most recent Form 10-K, Ebio's 2010 Attestation Report and at least one of Caskey's reports.

111.    In the written Securities Agreement signed by Wilson and the PIPE investors, Imperial falsely represented that: (i) its filings with the Commission during the preceding two years do not contain any untrue statements nor do they omit any material information; and (ii) Ebio is not in violation of any government statute, rule, ordinance or regulation.

**J.    WILSON AND CRAIG DUCEY LIED TO IMPERIAL'S OUTSIDE AUDITOR**

112.    Imperial hired Weaver, Martin & Samyn ("Weaver Martin"), a firm based in Kansas City, to be the outside auditor for its Form 10-K for fiscal year 2011 (hereinafter the "2011 10-K").

113.    Neither Wilson nor Craig Ducey disclosed to Weaver Martin the true nature of Ebio's business model, which required the use of the Middlemen Defendants to purchase millions of gallons of RINless B99.

114.    Wilson, Craig Ducey or employees under their direction also provided false documents to Weaver Martin.  For example, they gave Weaver Martin the same fabricated feedstock invoices that were provided to Weaver Tidwell for purposes of Ebio's 2010 Attestation Report.  As noted in Paragraphs 30 and 66 of this Complaint, many of these fabricated feedstock invoices were created and provided to Ebio by the Middlemen Defendants.

115.    Similarly, when Weaver Martin requested backup documentation for a sample of biodiesel transactions, Wilson, Craig Ducey or employees under their direction provided to Weaver Martin false BOLs and invoices incorrectly indicating that: (i) all biodiesel shipments originated at Ebio's Middletown facility; and (ii) the product sold by Ebio was B100 with valid RINs.

116.    Even though they knew that the relevant books and records did not properly record the RINless B99 purchased from the Middlemen Defendants and other transactions, Wilson and Craig Ducey signed management certification letters falsely stating that those records were complete and accurate and provided those false management representation letters to Weaver Martin.

117.    Even though he knew Ebio's books and records were false, Wilson consolidated Ebio's false books and records with Imperial's financial information in connection with his preparation of Imperial's quarterly and annual reports.

118.    Wilson and Craig Ducey also concealed known fraud allegations from Weaver Martin.

119.    Wilson and Craig Ducey both knew that Platinum did not invest in Imperial because FBA questioned the validity of Ebio's RINs.  Wilson and Craig did not provide this information to Weaver Martin.

120.    Wilson and Craig Ducey both knew that, in August 2011, a consultant for Imperial accused Craig Ducey and Chad Ducey of defrauding Ebio by selling biodiesel at below market prices to their former partner, Carmichael.  Wilson and Craig Ducey did not provide this information to Weaver Martin.

121.     In the signed management representation letters they provided to Weaver Martin, Wilson and Craig Ducey falsely stated that they were not aware of any fraud allegations.

122.     Wilson also misrepresented to Weaver Martin that he had provided minutes of all board meetings even though he knew that he did not provide minutes of the board meeting at which the consultant's fraud allegation was discussed.

### K.     IMPERIAL FILED FORMS 8-K CONTAINING FALSE PRESS RELEASES

123.     In the month before filing the 2011 10-K, Imperial issued two press releases.

124.     An Imperial press release dated September 16, 2011 quoted Wilson as stating that Ebio's facility was producing biodiesel "at capacity" and that Imperial expects to produce and sell 34 million gallons of biodiesel in fiscal year 2012.

125.     These statements are false; except for a de minimis amount, Ebio was not (and had not been) producing any biodiesel at the time it issued the September 16, 2011 press release.

126.     Another Imperial press release dated October 11, 2011 falsely stated that Imperial was engaged in biodiesel "production."  Although the October 11, 2011 release correctly stated that Imperial sold "26.4 million gallons of transportation biodiesel" in fiscal year 2011, the release did not disclose that the company did not produce the vast majority of that fuel, nor did it inform the reader that essentially all such sales were the result of the fraudulent recertification scheme.

127.     These two press releases (*i.e.*, the press releases dated September 16, 2011 and October 11, 2011) were included in separate Forms 8-K filed with the Commission by Imperial.

128.     Wilson had the ultimate authority to direct and control the release and distribution of both press releases and both Forms 8-K discussed in Paragraphs 123 through 127 of this

Complaint.  Wilson reviewed, approved and directed the release of both press releases and both

Forms 8-K discussed in Paragraphs 123 through 127 of this Complaint.

### L.   IMPERIAL'S FORM 10-K FOR FISCAL YEAR 2011 FALSELY STATED THAT EBIO USED RAW FEEDSTOCK TO PRODUCE BIODIESEL

129.    In October 2011, Wilson signed and certified the accuracy of Imperial's 2011 10-

K (*i.e.*, Imperial's Form 10-K for fiscal year 2011).

130.    Imperial's 2011 10-K contained numerous false statements and omissions—most

of which were made to perpetuate the false impression that Ebio produced biodiesel from raw

feedstocks through transesterification.  For example, the 2011 10-K stated:

- "We produce our biodiesel from a wide variety of feedstocks, including soy oil, inedible animal fat, used cooking oil and inedible corn oil."

- "We are reliant on certain strategic raw materials (such as soybean oil, waste greases and fats and methanol) for our operations."

- "Our ability to use a wide range of feedstocks gives us the flexibility to quickly respond to changes in feedstock pricing to maintain our feedstock cost advantage . . . .  As different feedstocks are delivered to the plant, they are segregated into our feedstock storage tanks, tested and the plant is tuned to optimize the processing of that specific feedstock."

- "We generally sell B100 to our customers."

- "[Ebio's] facility currently has the capacity to produce approximately 30-35 million gallons of biodiesel annually."

131.    Similarly, the footnotes to the financial statements contained in this filing

misrepresent that Imperial's principal business consisted of "biodiesel production."

132.    These statements are false.  Almost all of Ebio's claimed biodiesel production

was the result of RINless B99 purchased from one or more of the Middlemen Defendants.

133.    The product Ebio sold to its customers was actually RINless B99, even though the

accompanying invoice incorrectly identified it as B100 with valid RINs.  Thus, the price of

biodiesel feedstocks had almost no impact on Imperial's results for fiscal year 2011.

134.    Ebio's facility has never produced anywhere close to 30 million gallons of biodiesel on an annual basis.  Although Ebio sold approximately 26 million gallons of biodiesel in fiscal year 2011: (i) at least 92% of that claimed production was RINless B99 that was purchased from one or more of the Middlemen Defendants; and (ii) approximately 8.3 million gallons of that total were Ghost Loads, meaning that those 8.3 million gallons of biodiesel were never even present at, much less produced by, Ebio's Middletown facility.

135.    Imperial's 2011 10-K also falsely stated that Ebio is "BQ 9000 certified."  BQ 9000 is the name of the National Biodiesel Accreditation Program certified by the National Biodiesel Board ("NBB") and includes standards for testing, sampling, storage and shipping of biodiesel by producers.  Ebio has never been BQ 9000 certified.

136.    Imperial's 2011 10-K also falsely stated that "[a]ll of the 2011 services [performed by Weaver Martin] were approved by the Audit Committee . . . ."  Imperial did not have a separate Audit Committee, no individual or group purporting to be Imperial's Audit Committee ever made any report, presentation or statement to Imperial's Board of Directors and, other than Wilson, no board member or other individual approved the hiring of Weaver Martin or the fees paid to the firm.

137.    Imperial Board of Director Meeting minutes dated August 29, 2011 stated that John Ryer ("Ryer") was named Chairman of the Audit Committee.  Ryer was not present at that board meeting.

138.    After Imperial filed the 2011 10-K, Ryer wrote a letter to Wilson resigning from the Audit Committee because he had not been provided with the draft 10-K, financial information, accounting reviews or auditor correspondence prior to the filing of the 10-K.  In his

letter, Ryer related to Wilson his concern that Weaver Martin conducted its audit under the mistaken impression that Imperial had a functioning audit committee.

### M. WILSON GAVE A TOUR OF THE EBIO FACILITY TO CONCERNED PIPE INVESTORS AND FALSELY REPRESENTED THAT EBIO PRODUCES BIODIESEL THROUGH TRANSESTERIFICATION

139.    In October 2011, a PIPE investor contacted Imperial about the recent poor performance of Imperial's stock, which had lost 20% of its value in less than thirty days.

140.    To ease the PIPE invesetor's concerns, Wilson gave the investor a tour of the Ebio plant during which he described to the investor the chemical reaction used to create biodiesel from raw feedstock.

141.    During that tour, Wilson told the PIPE investor that the chemical reaction used by Ebio involves a catalyst and produces biodiesel and glycerin.  These statements were false or, at the very least, omitted material information.  Almost all of Ebio's claimed biodiesel production at that time and during the previous eighteen months was due to its fraudulent recertification of RINless B99, a process that did not involve a catalyst or any chemical reaction and did not produce glycerin or any other by-product.

### N. AFTER WILSON RESIGNED, FURANDO AND TRACY EXPLAINED THE FRAUDULENT RECERTIFICATION SCHEME TO IMPERIAL'S NEW CEO

142.    Wilson resigned as CEO of Imperial on or about November 7, 2011, citing health reasons.

143.    Shortly thereafter, Ryer was named the new CEO of Imperial.

144.    On or about November 17, 2011, Ryer traveled to Caravan's New Jersey offices and met with Furando and Tracy (hereinafter the "November 2011 New Jersey Meeting").

145.    During the November 2011 New Jersey Meeting, Furando and Tracy explained the fraudulent scheme to Ryer as follows: (i) the "feedstock" used by Ebio is actually fully

processed RINless B99; (ii) the RINs had already been separated from that fuel and the $1

Blenders' Tax Credit had already been taken before the fuel was purchased by Ebio; (iii) Ebio

does nothing to further process that fuel; (iv) Ebio fraudulently certifies that same fuel as B100

and creates RINs and another tax credit; and (v) Ebio sometimes used Ghost Loads to deliver

fuel from the fuel terminals directly to customers.

146.    During the November 2011 New Jersey Meeting, Furando told Ryer that when he

found out about the scheme he demanded "a piece of this action."

147.    During the November 2011 New Jersey Meeting, Furando and Tracy also told

Ryer that they "facilitate" the fraudulent scheme by acting as the middlemen between Ebio and a

specific Third-Party Biodiesel Supplier.

148.    During the November 2011 New Jersey Meeting, Furando explained to Ryer the

necessary and important role played by the Middlemen Defendants by stating, "No one's gonna

sell you B99.  And if they do, they're gonna ask you, 'Why is a biodiesel plant buying B99?'"

149.    During the November 2011 New Jersey Meeting, Furando told Ryer that the

fraudulent recertification scheme was not supposed to be 100% of Ebio's claimed production.

150.    During the November 2011 New Jersey Meeting, Furando and Tracy counseled

Ryer to take steps to create the appearance of actual biodiesel production.  For example, they

explained that there is a set formula for the amount of chemicals Ebio should be using in relation

to its claimed biodiesel production and, therefore, Ryer must buy chemicals even if he has to

"pour them down the sink."

151.    In January 2012, Ryer resigned as CEO of Imperial.

**O.      THE END OF THE SCHEME AND EBIO'S BANKRUPTCY**

152.      In late 2011, rumors circulated in the renewable fuel industry that Ebio purchased B99 and fraudulently recertified it as B100.

153.      In late 2011 and early 2012, Ebio's business dried up due to the industry rumors about its fraudulent recertification of biodiesel.

154.      After several months of little to no revenue, Ebio filed for bankruptcy in April 2012.

155.      In or about April 2012, Wilson once again became CEO for Imperial.

156.      Imperial's stock price declined from a high of $1.85 in July 2011 to less than $0.10 following the bankruptcy, resulting in a market loss in excess of $60 million.

157.      In total, from November 2009 through January 2012, Ebio falsely certified that it produced 35 million gallons of biodiesel and created 52.5 million false RINs.  Its scheme allowed for the creation of more than $35 million in false tax credits, and Defendants realized gross profits of more than $55 million.

**COUNT I**

**FRAUD IN THE OFFER OR SALE OF SECURITIES**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

158.    Paragraphs 1 through 157 are realleged and incorporated by reference herein.

159.    At all relevant times, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] made it unlawful for any person in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon purchasers of securities.

160.    By reason of the conduct described above, Defendants Imperial, Wilson, Craig Ducey, Chad Ducey and Carmichael, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud.

161.    By reason of the conduct described above, Defendants Imperial, Wilson, Craig Ducey, Chad Ducey and Carmichael, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, and with negligence; (i) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(ii) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon purchasers and/or prospective purchasers of securities.

162.     Defendants Imperial, Wilson, Craig Ducey, Chad Ducey and Carmichael violated Section 17(a) of the Securities Act [15 U.S.C. § 77q] by engaging in the conduct described above, including but not limited to the following:

*Imperial and Wilson Defrauded Actual and Potential Investors by*
*Issuing False and Misleading Forms 10-K and Forms 10-Q and by Providing*
*Those Forms 10-K and Forms 10-Q to Actual and Potential Investors*

(a)     As alleged above, including but not limited to Paragraphs 1-5, 34, 47, 50-58, 68, 73, 86-87, 110 and 129-138 of this Complaint, Defendants Imperial and Wilson, in public filings with the Commission, misrepresented material facts, failed to disclose material facts, and/or made misleading omissions of material facts regarding Ebio's business model and other matters.

*Craig Ducey, Chad Ducey and Carmichael Misrepresented that Ebio*
*Was Not Engaged in Illegal Conduct When They Sold Ebio to Imperial*

(b)     As alleged above, including but not limited to Paragraphs 1-5 and 28-33 of this Complaint, Defendants Craig Ducey, Chad Ducey and Carmichael misrepresented material facts, failed to disclose material facts, and/or made misleading omissions of material facts regarding Ebio's business model and/or Ebio's participation in illegal conduct when they sold Ebio to Imperial.

*Imperial, Wilson, Craig Ducey and Chad Ducey Each*
*Made Multiple Misstatements and Omissions to Platinum*

(c)     As alleged above, including but not limited to Paragraphs 1-5 and 68-99 of this Complaint, Defendants Imperial, Wilson, Craig Ducey and Chad Ducey misrepresented material facts, failed to disclose material facts, and/or made misleading omissions of

material facts regarding Ebio's business model and other matters in the offer or sale of securities to Platinum.

*Imperial and Wilson Defrauded PIPE Investors*

(d)      As alleged above, including but not limited to Paragraphs 1-5 and 106-111 of this Complaint, Defendants Imperial and Wilson misrepresented material facts, failed to disclose material facts, and/or made misleading omissions of material facts regarding Ebio's business model and other matters in the offer or sale of securities to the PIPE investors.

163.    Further, by reason of the conduct described above, in violation of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a) & (3)], Defendants Imperial, Wilson, Craig Ducey and Chad Ducey, directly or indirectly, by the use of the means or instruments of interstate commerce or of the mails, in the offer or sale of securities (i) knowingly or recklessly employed devices, schemes, or artifices to defraud; and/or  (ii) with negligence, engaged in transactions, practices, and/or courses of business which operated as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

164.    By reason of the foregoing, Defendants Imperial, Wilson, Craig Ducey, Chad Ducey and Carmichael violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

**COUNT II**

**Aiding and Abetting Violations of Sections 17(a)(1) and (3)
of the Securities Act [15 U.S.C. § 77q(a) & (3)]**

165.    Paragraphs 1 through 157 are realleged and incorporated by reference herein.

166.     As alleged above, including but not limited to Paragraphs 162-163 of this Complaint, Defendants Imperial, Wilson, Craig Ducey and Chad Ducey engaged in a scheme that violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a) & (3)].

167.     As alleged above, including but not limited to Paragraphs 1-5, 13-18, 29-31, 34-42, 59-61, 100-105, 113-114 and 142-150 of this Complaint, Defendants Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy knowingly or recklessly provided substantial assistance to Defendants Imperial, Wilson, Craig Ducey and Chad Ducey in their violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a) & (3)].

168.     Accordingly, Defendants Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy aided and abetted the violations described above and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Defendants Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy are liable for such violations.

**COUNT III**

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and
Rule 10b-5 [17 C.F.R. § 240.10b-5] Promulgated Thereunder**

169.     Paragraphs 1 through 157 are realleged and incorporated by reference herein.

170.     At all relevant times, Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5 [17 U.S.C. § 240.10b-5] thereunder made it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon any persons, in connection with the purchase or sale of any security.

171.    By reason of the conduct described above, in violation of Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5(b) [17 U.S.C. § 240.10b-5(b)] thereunder, Defendants Imperial, Wilson, Craig Ducey, Chad Ducey and Carmichael, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but limited to the following:

*Imperial and Wilson Defrauded Actual and Potential Investors by
Issuing False and Misleading Forms 10-K and Forms 10-Q and by Providing
Those Forms 10-K and Forms 10-Q to Actual and Potential Investors*

(a)     As alleged above, including but not limited to Paragraphs 1-5, 34, 47, 50-58, 68, 73, 86-87, 110 and 129-138 of this Complaint, Defendants Imperial and Wilson, in public filings with the Commission, knowingly or recklessly, misrepresented material facts, failed to disclose material facts, and/or made misleading omissions of material facts regarding Ebio's business model and other matters.

*Craig Ducey, Chad Ducey and Carmichael Misrepresented That Ebio
Was Not Engaged in Illegal Conduct When They Sold Ebio to Imperial*

(b)     As alleged above, including but not limited to Paragraphs 1-5 and 28-33 of this Complaint, Defendants Craig Ducey, Chad Ducey and Carmichael, knowingly or recklessly, misrepresented material facts, failed to disclose material facts, and/or made misleading omissions of material facts regarding Ebio's business model and/or Ebio's participation in illegal conduct when they sold Ebio to Imperial.

*Imperial and Wilson Defrauded PIPE Investors*

(c)      As alleged above, including but not limited to Paragraphs 1-5 and 106-111 of this Complaint, Defendants Imperial and Wilson, knowingly or recklessly, misrepresented material facts, failed to disclose material facts, and/or made misleading omissions of material facts regarding Ebio's business model and other matters in the offer or sale of securities to the PIPE investors.

172.      Further by reason of the conduct described above, in violation of Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder, Defendants Imperial, Wilson, Craig Ducey and Chad Ducey, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly (i) employed devices, schemes or artifices to defraud or (ii) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

173.      By reason of the foregoing, Defendants Imperial, Wilson, Craig Ducey, Chad Ducey and Carmichael violated, and unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## COUNT IV

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) & (c)] Promulgated Thereunder**

174.      Paragraphs 1 through 157 are realleged and incorporated by reference herein.

175.      As alleged above, including but not limited to Paragraphs 171-172 of this Complaint, Defendants Imperial, Wilson, Craig Ducey and Chad Ducey engaged in a scheme

that violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) & (c)] thereunder.

176.    As alleged above, including but not limited to Paragraphs 1-5, 13-18, 29-31, 34-42, 59-61, 100-105, 113-114 and 142-150 of this Complaint, Defendants Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy knowingly or recklessly provided substantial assistance to Defendants Imperial, Wilson, Craig Ducey and Chad Ducey in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) & (c)] thereunder.

177.    Accordingly, Defendants Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy aided and abetted the violations described above and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy are liable for such violations.


## COUNT V

## REPORTING VIOLATIONS

**Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]
and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1], 13a-11
[17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13] Promulgated Thereunder**

178.    Paragraphs 1 through 157 are realleged and incorporated by reference herein.

179.    As alleged above, including but not limited to Paragraphs 1-5, 34, 47, 50-58 and 123-138 of this Complaint, Defendant Imperial filed with the Commission materially false and misleading periodic reports, including annual reports on Forms 10-K for fiscal years 2010 and 2011, quarterly reports on Forms 10-Q for the first, second and third quarters of fiscal year 2011 and reports on Forms 8-K during September and October 2011.

180.    By reason of the foregoing, Defendant Imperial violated, and unless enjoined, will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13] promulgated thereunder.

### COUNT VI

**Aiding and Abetting Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13] Promulgated Thereunder**

181.    Paragraphs 1 through 157 are realleged and incorporated by reference herein.

182.    As alleged above, including but not limited to Paragraphs 1-5, 34, 47, 50-58, 112-138 and 178-180 of this Complaint, Defendant Imperial violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13] thereunder by filing with the Commission materially false and misleading periodic reports, including annual reports on Forms 10-K for fiscal years 2010 and 2011, quarterly reports on Forms 10-Q for the first, second and third quarters of fiscal year 2011 and reports on Forms 8-K in September and October 2011.

183.    Defendants Wilson and Craig Ducey knowingly or recklessly provided substantial assistance to Defendant Imperial in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13], including but not limited to the following:

*Wilson Aided and Abetted Imperial's Violations Relating to Imperial's Forms 10-K*
*for Fiscal Years 2010 and 2011, Forms 10-Q for the First, Second and Third*
*Quarters of Fiscal Year 2011 and Forms 8-K Filed in September and October 2011*

(a)      As alleged above, including but not limited to Paragraphs 1-5, 34, 47, 50-58 and 112-138 of this Complaint, Defendant Wilson knowingly or recklessly provided substantial assistance to Imperial in its violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13] thereunder in connection with Imperial's filing of its annual reports on Forms 10-K for fiscal years 2010 and 2011, quarterly reports on Forms 10-Q for the first, second and third quarters of fiscal year 2011 and reports on Forms 8-K in September and October 2011.

*Craig Ducey Aided and Abetted Imperial's Violations*
*Relating to Imperial's Form 10-K for Fiscal Year 2011*

(b)      As alleged above, including but not limited to Paragraphs 1-5, 112-121 and 129-138 of this Complaint, Defendant Craig Ducey knowingly or recklessly provided substantial assistance to Imperial in its violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20] and 13a-1 [17 C.F.R § 240.13a-1] thereunder in connection with Imperial's filing of its annual report on Form 10-K for fiscal year 2011.

184.      Accordingly, Defendants Wilson and Craig Ducey aided and abetted the violations described above and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Wilson and Craig Ducey are liable for such violations.

## COUNT VII

## RECORD-KEEPING VIOLATIONS

### Violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]

185.     Paragraphs 1 through 157 are realleged and incorporated by reference herein.

186.     As alleged above, including but not limited to Paragraphs 1-5, 37-42, 59, 64-67 and 112-117 of this Complaint, Defendant Imperial failed to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of assets, including, but not limited to, Imperial's failure to properly record (i) its purchases of RINless B99 from the Middlemen Defendants; (ii) its re-sale of that same RINless B99 to its customers; and (iii) the Ghost Loads.

187.     By reason of the foregoing, Defendant Imperial violated, and unless enjoined, will continue to violate, Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78M(b)(2)(A)].

## COUNT VIII

### Aiding and Abetting Violations of Section 13(b)(2)(A)
### of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]

188.     Paragraphs 1 through 157 are realleged and incorporated by reference herein.

189.     As alleged above, including but not limited to Paragraphs 1-5, 37-42, 59, 64-67, 112-117 and 185-187 of this Complaint, Defendant Imperial violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of assets, including, but not limited to, Imperial's failure to properly record (i) its purchases of RINless B99 from the Middlemen Defendants; (ii) its re-sale of that same RINless B99 to its customers; and (iii) the Ghost Loads.

190.     As alleged above, including but not limited to Paragraphs 1-5, 37-42, 59, 64-67 and 112-117 of this Complaint, Defendants Wilson, Craig Ducey, Chad Ducey and Carmichael knowingly or recklessly provided substantial assistance to Imperial in its violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

191.     Accordingly, Defendants Wilson, Craig Ducey, Chad Ducey and Carmichael aided and abetted the violations described above and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Wilson, Craig Ducey, Chad Ducey and Carmichael are liable for such violations.

**COUNT IX**

**FALSIFICATION OF RECORDS**

**Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] Promulgated Thereunder**

192.     Paragraphs 1 through 157 are realleged and incorporated by reference herein.

193.     As alleged above, including but not limited to Paragraphs 1-5, 37-42, 59, 64-67 and 112-117 of this Complaint, Defendants Wilson, Craig Ducey, Chad Ducey and Carmichael knowingly falsified or caused to be falsified Imperial books, records and/or accounts as those terms are used in Section 13(b)(2) of the Exchange Act.

194.     By reason of the foregoing, Defendants Wilson, Craig Ducey, Chad Ducey and Carmichael violated, and unless enjoined, will continue to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] promulgated thereunder.

## COUNT X

## FALSE STATEMENTS TO ACCOUNTANTS

### Violations of Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2]

195.    Paragraphs 1 through 157 are realleged and incorporated by reference herein.

196.    As alleged above, including but not limited to Paragraphs 1-5 and 112-122 of this Complaint, Defendants Wilson and Craig Ducey, directly or indirectly, (i) made, or caused to be made, materially false or misleading statements or (ii) omitted to state, or caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

197.    By reason of the foregoing, Defendants Wilson and Craig Ducey violated, and unless enjoined, will continue to violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## COUNT XI

### Aiding and Abetting Violations of Violations of Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2]

198.    Paragraphs 1 through 157 are realleged and incorporated by reference herein.

199.    As alleged above, including but not limited to Paragraphs 1-5, 112-122 and 195-197 of this Complaint, Defendant Wilson, directly or indirectly, violated Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2] by (i) making, or causing to be made, materially false or misleading statements or (ii) omitting to state, or causing others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of

financial statements or the preparation or filing of a document or report required to be filed with the Commission.

200.    As alleged above, including but not limited to Paragraphs 1-5 and 112-122 of this Complaint, Defendant Craig Ducey knowingly or recklessly provided substantial assistance to Wilson in his violation of Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

201.    Accordingly, Defendant Craig Ducey aided and abetted the violations described above and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Craig Ducey is liable for such violations.

## COUNT XII

## CERTIFICATION VIOLATIONS

### Violations of Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14]

202.    Paragraphs 1 through 157 are realleged and incorporated by reference herein.

203.    As alleged above, including but not limited to Paragraphs 1-5, 34, 47, 50-58, 112-122 and 129-138 of this Complaint, Defendant Wilson violated Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14] by signing the certifications included with Imperial's Forms 10-K for fiscal years 2010 and 2011 and Forms 10-Q for the first, second and third quarters of fiscal year 2011, falsely certifying, among other things, that the forms fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company, when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading.

204.    By reason of the foregoing, Defendant Wilson violated, and unless enjoined, will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## COUNT XIII

## CONTROL PERSON LIABILITY

### Violations of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]

205.    Paragraphs 1 through 157 are realleged and incorporated by reference as if set forth fully herein.

206.    Imperial violated: (i) Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder as described in Count III above, which is incorporated by reference as if set forth fully herein; (ii) Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13] promulgated thereunder as described in Count V above, which is incorporated by reference as if set forth fully herein; and (iii) Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] as described in Count VII above, which is incorporated by reference as if set forth fully herein.

207.    Defendant Wilson was the CEO and sole executive of Imperial from at least January 2010 through November 7, 2011 and he controlled the day-to-day affairs of Imperial and possessed and exercised, directly or indirectly, the power to direct or cause the direction of the management and policies of Imperial.

208.    Defendant Wilson directed Craig Ducey and Chad Ducey to mislead FBA during the Platinum offering.

209.    Defendant Wilson was involved in the improper actions, misrepresentations and omissions by Imperial described above, including, but not limited to: (i) the drafting, certification and filing of Imperial's false and misleading Forms 10-K for fiscal years 2010 and 2011 and Forms 10-Q for the first, second and third quarters of 2011; (ii) Imperial's fraudulent statements

and omissions made to the PIPE investors; (iii) the drafting and filing of Imperial's false and

misleading reports on Forms 8-K during September and October 2011; (iv) Imperial's failure to

make or keep books, records and accounts that in reasonable detail accurately and fairly reflected

its transactions and disposition of assets, including, but not limited to, Imperial's failure to

properly record (a) its purchases of RINless B99 from the Middlemen Defendants, (b) its re-sale

of that same RINless B99 to its customers, and (c) the Ghost Loads; and (v) the fraudulent

scheme set forth in Count III above.

210.    Defendant Wilson directly or indirectly controlled Imperial within the meaning of

Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

211.    Defendant Wilson knowingly or recklessly, directly or indirectly, induced acts

constituting violations of: (i) Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder; (ii) Section 13(a) of the Exchange Act

[15 U.S.C. § 78m(a)] and Rules 12b-20 [17 C.F.R § 240.12b-20], 13a-1 [17 C.F.R § 240.13a-1],

13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R § 240.13a-13] promulgated thereunder;

and (iii) Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

212.    Defendant Wilson is liable as a control person for Imperial's violations of the

Exchange Act set forth in Paragraph 205 above.

213.    Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Defendant

Wilson is liable jointly and severally with and to the same extent as Imperial.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

### II.

Issue an Order of Permanent Injunction, in a form consistent with Federal Rule of Civil Procedure 65(d), restraining and enjoining Defendants Imperial, Wilson, Craig Ducey, Chad Ducey, Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III.

Issue an Order of Permanent Injunction, in a form consistent with Federal Rule of Civil Procedure 65(d), restraining and enjoining Defendant Imperial and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with it, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

IV.

Issue an Order of Permanent Injunction, in a form consistent with Federal Rule of Civil Procedure 65(d), restraining and enjoining Defendant Wilson and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 13(a), 13(b)(2)(A), 13(b)(5) and 20(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 13a-14, 13b2-1 and 13b2-2 thereunder.

V.

Issue an Order of Permanent Injunction, in a form consistent with Federal Rule of Civil Procedure 65(d), restraining and enjoining Defendant Craig Ducey and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 13(a), 13(b)(2)(A) and 13(b)(5) of the Exchange Act and Rules 12b-20, 13a-1, 13b2-1 and 13b2-2 thereunder.

VI.

Issue an Order of Permanent Injunction, in a form consistent with Federal Rule of Civil Procedure 65(d), restraining and enjoining Defendant Chad Ducey and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 13(b)(2)(A) and 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

VII.

Issue an Order of Permanent Injunction, in a form consistent with Federal Rule of Civil Procedure 65(d), restraining and enjoining Defendant Carmichael and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

VIII.

Order Defendants Imperial, Wilson, Craig Ducey, Chad Ducey, Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy, to disgorge all ill-gotten gains, with prejudgment interest.

IX.

Order Defendants Imperial, Wilson, Craig Ducey, Chad Ducey, Carmichael, Furando, Tracy, Caravan, CIMA Green and CIMA Energy to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

X.

Order that Defendant Wilson—as a control person for Defendant Imperial—is liable jointly and severally and to the same extent as Defendant Imperial.

XI.

Order that, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Defendants Wilson, Craig Ducey,

Chad Ducey and Carmichael are prohibited from acting as an officer or director of any issuer that

has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l],

or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §

78o(d)].

XII.

Grant such other and further relief as may be necessary and appropriate.

XIII.

Retain jurisdiction of this action to implement and carry out the terms of all orders and

decrees that may be entered, or to entertain any suitable application or motion for additional

relief within the jurisdiction of this Court.

Respectfully submitted,

DATED: September 18, 2013

s/ Anne Graber Blazek_____ _____
JOHN E. BIRKENHEIER
   (312) 886-3947 / birkenheierj@sec.gov
ANNE GRABER BLAZEK
   (312) 886-8505 / blazeka@sec.gov

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE
COMMISSION
Chicago Regional Office
175 West Jackson Boulevard, Suite 900
Chicago, Illinois  60604